UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| UNITED STATES OF AMERICA, | ) |  |
|---|---|---|
|  | ) |  |
| v. | ) |  |
|  | ) | Docket no. 2:18-cr-00063-GZS |
| RICHARD DANIELS, et al. | ) |  |
|  | ) |  |
| Defendants. | ) |  |

**ORDER ON DEFENDANTS' MOTIONS TO DISMISS OR ENJOIN PROSECUTION**

On October 5, 2018, the Government filed a Superseding Indictment (ECF No. 82) charging a number of individuals and corporate entities with a range of counts related to alleged marijuana distribution. Defendants Tyler Poland, Ty Properties, LLC & Ty Construction, LLC (together, the "Poland Defendants") filed a Motion to Dismiss Prosecution Pursuant to the Rohrabacher-Farr Amendment (ECF No. 334) in May 2019, and, in July, Defendants Brian Bilodeau & Brian Bilodeau, LLC (together, the "Bilodeau Defendants") moved to dismiss or enjoin prosecution under what they referred to as the "Rohrabacher-Blumenauer Amendment" (ECF No. 404). MR, LLC ("MR") joined the Bilodeau Defendants' Motion (ECF No. 410). On October 3 and 4, this Court held an evidentiary hearing on the Defendants' Motions and, at the close, ordered post-hearing briefing. Having reviewed that briefing (ECF Nos. 616, 619, 620, 648, 651, 655, & 659) and considered all of the evidence presented, the Court DENIES the Motions for the reasons explained herein.

## I. BACKGROUND

Since 2014, the annual federal appropriations law has included a rider that prohibits the Department of Justice ("DOJ") from using congressionally appropriated funds to interfere with the implementation of state medical marijuana laws. See Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, § 537, 133 Stat. 13, 138 (2019); Pub. L. No. 113-235, § 538, 128 Stat. 2130, 2217 (2014). The current rider, which is in all relevant ways identical to any previous iterations implicated by these Motions, states:

> None of the funds made available under this Act to the Department of Justice may be used, with respect to any of the States of Alabama, . . . Maine, . . . or Puerto Rico, to prevent any of them from implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana.

The rider is commonly known as the "Rohrabacher-Farr Amendment" or the "Rohrabacher-Blumenauer Amendment," in recognition of certain legislative sponsors. For the purposes of this Order, the Court refers to it simply as "the Amendment."

In 2016, the Ninth Circuit, the only court of appeals yet to have considered the effect of the Amendment on prosecutions for alleged marijuana crimes, concluded that "federal criminal defendants may," based on the rider, "seek to enjoin the expenditure" of DOJ funds on their prosecution. United States v. McIntosh, 833 F.3d 1163, 1173 (9th Cir. 2016). The Ninth Circuit held that such defendants are entitled to enjoin their prosecution if, following an evidentiary hearing, the court concludes "their conduct was completely authorized by state law" governing medical marijuana, i.e., "they strictly complied with all relevant conditions imposed by state law on the use, distribution, possession, and cultivation of medical marijuana." Id. at 1179.

Defendants argue that their conduct was completely authorized by the Maine Medical Use of Marijuana Act. See 22 M.R.S.A. § 2421 *et seq.* Thus, they move to enjoin prosecution pursuant

to the Amendment. For its part, the Government opposes the relief sought by Defendants, but did not oppose an evidentiary hearing under the McIntosh framework.[1]

On October 3 and 4, 2019, the Court held an evidentiary hearing on the moving Defendants' strict compliance with Maine's medical marijuana laws. In advance of the hearing, the Poland Defendants filed a Motion Regarding the Parties' Burdens Under Rohrabacher-Farr, which MR and the Bilodeau Defendants joined (ECF Nos. 549, 552 & 554). On October 2, 2019, the Court denied their Motion (ECF No. 559), concluding that the moving Defendants bore the burden of establishing their strict compliance with Maine's medical marijuana laws by a preponderance of the evidence.[2] In the section that follows, the Court lays out the facts Defendants ultimately established by a preponderance of the evidence submitted at the hearing.

## II. FACTUAL FINDINGS

By early 2018, law enforcement was investigating the possible illegal distribution of marijuana under the guise of the Maine Medical Use of Marijuana Program (MMMP).[3] In relevant

---

[1] Because the Government has not opposed proceeding under the framework developed in the Ninth Circuit, the Court proceeds on the assumption that the First Circuit would adopt the standing analysis found in McIntosh. In that case, the Ninth Circuit found individual standing based on Bond v. United States, 564 U.S. 211 (2011). See McIntosh, 833 F.3d at 1173-74. However, the challenge in Bond involved reliance on a claimed violation of the Tenth Amendment, whereas the challenge here relies on a violation of an appropriations rider, which, in turn, is focused on protecting the ability of various states to implement medical marijuana statutes. See Bond, 564 U.S. at 214. On a blank slate, this Court might find that this difference should limit standing to the States themselves. However, in the absence of any guidance from the First Circuit on its interpretation of Bond and any objection from the Government, the Court finds no basis to depart from the standing analysis of McIntosh.

[2] See United States v. Evans, 929 F.3d 1073, 1077 (9th Cir. 2019) (clarifying that in an evidentiary hearing to determine whether defendants are entitled to an injunction barring their prosecution pursuant to the rider, the defendants bear the burden of "persuading the court that it is more likely than not that the state's medical-marijuana laws 'completely authorized' their conduct"); United States v. Gentile, 782 Fed. App'x 559, 562 (9th Cir. 2019) ("[W]hen a criminal defendant seeks to enforce the [Amendment,] the defendant is seeking *injunctive* relief. As with any request for an injunction, the criminal defendant seeking such an injunction bears the burden of proving compliance by preponderance of the evidence."); Boston Beer Co. Ltd. P'ship v. Slesar Bros. Brewing Co., Inc., 9 F.3d 175, 177 (1st Cir. 1993) (affirming the district court's application of a preponderance standard to the appellant's request for an injunction).

[3] The MMMP is the name given to the program run by the Department of Health and Human Services; that program is governed by technical rules promulgated pursuant to 22 M.R.S.A. § 2422-A(2).

3

part, their investigation focused on three different marijuana growing facilities located in Auburn, Maine: (1) 230 Merrow Road, (2) 249 Merrow Road, and (3) 586 Lewiston Junction Road.

### A. 230 Merrow Road

The 230 Merrow property is a warehouse that was purchased by MR on November 1, 2016.[4] (Gov't Ex. A-11.) The warehouse contains multiple grow rooms for the cultivation of marijuana at different stages of maturity. (MR Exs. 4-8; Tr. (ECF Nos. 599 & 600) 444-45.)

From sometime in 2016 until February 27, 2018, the grow rooms at 230 Merrow were regularly used by two individuals, Danny Bellmore and Brandon Knutson, both of whom were registered with the MMMP as medical marijuana caregivers growing at 230 Merrow. Knutson described 230 Merrow Road as "on its face . . . fully compliant" with the MMMP. (Tr. 472.) He and Bellmore aimed to grow only the number of plants authorized by law and to tag plants per MMMP regulations. (Tr. 472, 480.) The MMMP required that caregivers be "designated" by the patients for whom they cultivated and possess designation cards provided by those patients. So, in accordance with this requirement, Knutson and Bellmore displayed their MMMP registration paperwork and patient designation cards outside their grow rooms. However, Knutson himself never distributed the marijuana he grew to the people whose patient cards hung outside his grow room, and he never met or knew those patients. (Tr. 451.) Knutson also never submitted sales tax returns for any medical marijuana sales, and he did not have a lease or pay for rent or utilities at 230 Merrow. (Gov't Ex. A-7; Tr. 447-48.)

Up until sometime in 2017, Timmy Bellmore and Brian Bilodeau managed operations at 230 Merrow.[5] That is, they paid Knutson and Danny Bellmore an hourly wage for tending the

---

[4] At the time of sale, MR also entered into a separate agreement whereby 230 Merrow's seller loaned MR, Kevin Dean (MR's sole member), and Brian Bilodeau $450,000, to be repaid in monthly no-interest installments of $50,000; 230 Merrow served as security for the loan. Gov't Ex. A-12.

[5] Timmy Bellmore is not a party to this proceeding, but he was charged in the Superseding Indictment.

4

marijuana grows, purchased nutrients and soil necessary for the grows, and picked up marijuana from the site once it was cured and ready for use. (Tr. 448.) At some point in 2017, Timmy Bellmore and Bilodeau severed ties. Bilodeau continued to manage operations at 230 Merrow in similar fashion, but without Bellmore.

Timmy Bellmore and Bilodeau also provided the growers at 230 Merrow with patient cards.[6] (Tr. 451.) A patient whose card hung outside Knutson's grow room on February 27, 2018, Lorraine Acheson, was paid to obtain that patient card by someone she believed to be working for Bellmore. Acheson never used the card herself. She did not know Knutson and never received marijuana from him. (Tr. 434-37.) Once, when a couple of Knutson's patient cards expired, Bilodeau sent him to a grow site known as "Cascades" to obtain new ones. (Tr. 451-53.)

### B. 586 Lewiston Junction Road

The Cascades facility, where Knutson was sent to obtain patient cards, is located at 586 Lewiston Junction Road. Like 230 Merrow, Cascades is a warehouse containing multiple individual grow rooms. The grow operation at Cascades was established sometime after Knutson started work at 230 Merrow. In fact, he helped start the Cascades grow by moving in its first plants, staking them up, and cloning plants. (Tr. 453.)

The Cascades facility was inspected by MMMP authorities on January 10, 2018, and found compliant. (Gov't Ex. A-37.) At that time, Bilodeau, Kevin Dean, Cecile Dean, and Marshall Dean were all registered as caregivers with indoor grows at the site. In addition to the indoor grows, the Cascades facility had an unfenced outdoor grow area for which no caregiver was registered. (Gov't Exs. A-8-A-10, A-37; Tr. 378.)

---

[6] Knutson testified that his patient cards were given to him by Timmy Bellmore and Bilodeau and that he and Danny played similar roles and were managed similarly at 230 Merrow. (Tr. 451.) On this record, the Court finds it more likely than not that Danny also received patient cards from Timmy and Bilodeau.

5

Cascades was generally understood to belong to Kevin Dean.[7] However, Knutson regarded Bilodeau as the site's "boss." (Tr. 479.) Knutson believed Dean and Bilodeau to be partners in the marijuana business at both 230 Merrow and Cascades; he reached this conclusion because he knew of Bilodeau and Dean attending marijuana grower conventions together, from which they had once brought back a marijuana trimming machine, and he understood them both to be involved in establishing the grow facilities at the two locations. (Tr. 457-60.) Knutson saw Dean at 230 Merrow at least once and at Cascades, with Bilodeau, a handful of times. (Tr. 470.) Knutson also transported a trimming machine between 230 Merrow and Cascades, as directed by Timmy or Bilodeau. (Tr. 474.)

**C. 249 Merrow Road**

Since December 2017, 249 Merrow Road has been owned by Ty Properties, LLC.[8] (Gov't Ex. A-13.) One warehouse on the property contains several rooms on the first floor and offices on the second. (Tr. 37-38.) Another warehouse contains a large garage bay area and individual grow rooms for mature and immature marijuana plants. For at least some time during the relevant period, the property also housed an unfenced outdoor grow. (Gov't Ex. E-30; Tr. 418-19.) It is not clear who grew at 249 Merrow before roughly 2018 or when marijuana growing at this location commenced. But as of February 27, 2018, six individual caregivers were registered to operate indoor grow rooms at the site and had lease agreements with Tyler Poland to rent out those spaces. (Poland Exs. 1-6.) According to Catherine Lewis, an expert retained by the Poland Defendants, the paperwork on site at 249 Merrow on February 27, 2018 was in "full compliance" with the

---

[7] Bilodeau told MMMP authorities that Dean owned the building. See Gov't Ex. A-37. Knutson believed Dean to be the building's owner.

[8] Tyler Poland filed to register Ty Properties, LLC as a business with the purpose of holding real estate, under the address of 249 Merrow Road, on September 8, 2017, and its status as an LLC was current in 2018. Gov't Ex. A-32.

6

MMMP. (Tr. 59-60.) Lewis also concluded that the caregivers registered there as of that date were in compliance with MMMP licensing requirements. (Tr. 67.)

### D. The Trim Crews

From sometime in 2015 up until February 27, 2018, so-called "trim crews" provided services to marijuana grow facilities in the Lewiston-Auburn area, including the three just described. (Tr. 235-37, 371-73, 408, 410.) Trim crews were groups of people ranging in number from five to ten who would assemble at a growing facility to trim buds from flowering marijuana plants.[9] Certain members of the crew would access the grow and harvest the plants, and the rest would trim the plants down further. Trimmers were paid an hourly wage in cash, the source of which depended on the grow site where they had completed the trim. Bilodeau generally paid for trimmers' work at Cascades and 230 Merrow, Poland paid for work at 249 Merrow, and Timmy Bellmore paid for work at other locations. (Tr. 240, 382-83, 387, 395.) Keith Williams, who acted as head of a trim crew during some of this period, testified that either Bilodeau or Poland would give him a "heads-up" as to when trim crews were needed at particular locations. (Tr. 411.) Then, Williams would tally up the hours for trim crew members and send those tallies to either Bilodeau or Poland, who, in turn, gave him money to pay the trimmers. (Tr. 415.)

### E. The Execution of the Search Warrants

On February 27, 2018, federal law enforcement executed search warrants on the 230 and 249 Merrow facilities, as well as on Bilodeau's residence at 72 Danville Corner Road. The agents who searched 230 Merrow encountered a locked building into which they forced entry. (Tr. 167.) Inside, they observed five independent grow rooms, some number of which (perhaps all) were

---

[9] There was a stable of trimmers who could be called to staff crews. Among this group, a son of Kevin Dean occasionally showed up for trims. Tr. 414.

7

locked. (Tr. 169-70.) In total, the agents removed 321 plants, 30 of which they described as "large;" the remaining 291 were described as "varying smaller, less mature" sizes. (Tr. 170-71.) After the search and seizure, the agents preserved a representative sample of the seized marijuana; the rest was destroyed. (Tr. 177-78.) Video and photographic evidence of the seized marijuana before its destruction corroborates the agents' recorded counts but is insufficiently detailed to evaluate whether the plant totals would have been compliant with all MMMP regulations. (MR Exs. 5-8.)

The seizing team at 230 Merrow also uncovered what they recorded as 82.42 kilograms (approximately 181 pounds) of processed marijuana contained in clear plastic bags. (MR Ex. 15; Tr. 166.) Whether this marijuana could be classified as prepared marijuana under the MMMP was called into question by Hillary Lister, an expert retained by the Bilodeau Defendants. (Tr. 232.) Lister observed at least one "Boveda pack" in a photograph of the bags seized at 230 Merrow; she testified that the Boveda pack's presence indicated the marijuana was still curing and therefore would not be properly classified as "prepared or processed" under the MMMP. (Tr. 232.)

Federal agents who searched 249 Merrow seized 41 pounds of marijuana in 76 heat-sealed bags, 34 marijuana plants, and 186 pounds of "shake"—the fan leaves, stalks, roots and other parts of the marijuana plant generally discarded once the buds have been harvested—from the warehouse with the second-floor offices. (Tr. 32, 70.) In that building, they observed a vacuum oven for making marijuana extract with butane hash oil. (Gov't Exs. E-11 & E-12.) Agents seized approximately 104 pounds of marijuana from the other warehouse. (Tr. 34.) In total, 574 marijuana plants were seized. (Tr. 37.) The agents also seized pills (later identified as alprazolam and MDMA) and a variety of documents from the second-floor offices in the first warehouse. (Gov't Exs. E-26 & E-27.)

The documents seized from the offices at 249 Merrow included paperwork required under the MMMP. They also included a variety of handwritten documents that recorded apparent payments to trimmers and a notebook documenting apparent marijuana sales transactions. (Gov't Exs. E-15-E-21.) The notebook is dated in a manner indicating records spanning December 2016 to February 6, 2018; the pages list the pounds of various marijuana strands that were apparently sold in different transactions, with multiple pages documenting cash payments of over $50,000. (Gov Ex. E-17; Tr. 142.) Additionally, many lists of figures appear below state abbreviations, such as "MD," "NY," and "GA," suggesting out-of-state distribution.

At 72 Danville Corner Road, agents seized approximately twelve trash bags and approximately seven plastic blue bins of clear plastic bags containing harvested marijuana buds. They retained a representative sample, which was tested to confirm the presence of marijuana. (Gov't Ex. 15.) The rest of the seized marijuana was destroyed. Agents also seized several large sheets of "shatter" (marijuana concentrate), which they did not weigh before destroying. (Tr. 330.) The seized marijuana had "a lot of stem, leaves, seeds, and other debris" characteristic of black-market marijuana. (Tr. 261.) Based on the limited photo and video documentation, Lister (the Bilodeau Defendants' expert witness) found it impossible to determine what portion of the seized marijuana qualified as prepared and which would qualify as incidental under the MMMP. (Tr. 211-14, 216-17, 264, 290-91, 294-95.) Nonetheless, based on her analysis, the quantity of marijuana seized at 72 Danville Corner Road was consistent with a MMMP-sanctioned grow at Cascades. (Tr. 286-87.)

Agents also seized a number of documents from a safe room that also contained bulk marijuana, a money counter, and a loaded handgun at the time of the search. A Task Force Agent who reviewed the seized documents identified them as drug ledgers. (Gov't Exs. B-22-B-24, B-47-B-56, B-61; Tr. 340-41.) They included various notations as to amounts of sales; costs of

9

"trimmers," electricity, labor, etc.; and amounts owed to different people, including a "Tim," "Brian," "Kevin," and "Kev." One sheet of notations listed "$347,700 total sales" under the heading "Cascades 32 199lbs." (Gov't Ex. B-29.) Catherine Lewis indicated that in her experience "$40,000 and up" was the upper end of annual revenue for a totally compliant caregiver. (Tr.127.)

### III. DISCUSSION

The Maine Medical Use of Marijuana Act effective at the time of the charged conduct authorized so-called "primary caregivers" to carry out a variety of specified activities "for the purpose of assisting a qualifying patient who ha[d] designated the primary caregiver" to assist him or her with the medical use of marijuana. 22 M.R.S.A. § 2423-A(2) (2016) (amended July 1, 2018). These activities included, *inter alia*, cultivating up to six mature marijuana plants per patient; possessing up to 2.5 ounces of prepared marijuana per patient and an unlimited amount of "incidental" marijuana; assisting a maximum of five patients; receiving reasonable monetary compensation for costs associated with cultivating marijuana plants; disposing excess prepared marijuana by "transfer[ring] prepared marijuana to a registered dispensary, a qualifying patient or another primary caregiver if nothing of value is provided to the primary caregiver" or "to a registered dispensary for reasonable compensation;" and "[e]mploy[ing] one person to assist in performing the duties of the primary caregiver." Id. The MMMP Rule effective at the time of the charged offenses stated, "The protections and requirements of these rules are for conduct that is expressly authorized by these rules for the legal medical use of marijuana by qualifying patients, and for those who assist qualifying patients as primary caregivers." (Ex. A-15, Rule 2.1.)[10] A

---

[10] At the evidentiary hearing, the Government entered two versions of the Maine Medical Marijuana Program Rules as Exhibits A-15 and A-16. Defendants disputed whether the second version, Exhibit A-16, was in effect at the time of the charged conduct. Since the Government cites only to Exhibit A-15 in its post-hearing briefing and the Court concludes that its strict-compliance analysis is not affected by which version of the Rule was in effect at the time, it cites to the Rule as published in Exhibit A-15.

"qualifying patient" was defined as "a person who has been diagnosed by a medical provider as having a debilitating medical condition and who possesses a valid written certification regarding medical use of marijuana." 22 M.R.S.A. § 2422(9) (2016) (amended May 2, 2018).

At the outset, the Court acknowledges that the moving Defendants raise a variety of interesting arguments regarding the strict compliance standard. Urging that "strict compliance" should allow some level of noncompliance that would otherwise be tolerated by state authorities, they contend that imposing a higher compliance standard will chill and therefore interfere with Maine's medical marijuana laws, contrary to the Amendment's intent. They also argue that they cannot be found noncompliant with Maine medical marijuana law because it remains unclear whether their conduct would provide grounds for or, as a practical matter, be subject to enforcement by Maine authorities. The Court leaves these arguments about the nature of "strict compliance" for another day. Simply put, the noncompliance established at the evidentiary hearing is so contrary to the basic purpose and fundamental scope of Maine's medical marijuana laws that the outcome here does not depend on the precise limits of strict compliance.

Even assuming reasonable limits to Maine's enforcement capacity and some uncertainty as to specific parameters of the MMMP during the time period in question, Maine's medical marijuana laws did not authorize the sort of misconduct evidenced at the hearing—namely, a fundamental disregard of the rules regarding how and to whom medical marijuana may be lawfully distributed.[11]  See also Evans, 929 F.3d at 1077 (stating that the rider-applicability analysis should focus on "the state law's *substantive* authorizations" rather than "the *procedural rules* that give

---

[11] This conclusion also causes the Court to disregard the Poland Defendants' argument that Maine's medical marijuana laws, the Controlled Substances Act, and the Amendment ought to be interpreted under the Rule of Lenity and with Due Process concerns in mind. While there may have been some ambiguities in the proper interpretation of federal and state law governing marijuana, it was entirely clear that these laws did not authorize the conduct evidenced at the hearing.

practical effect to the state's medical-marijuana regime"). Thus, the Court's conclusion that Defendants did not strictly comply with Maine's medical marijuana laws is not based on some sort of technical noncompliance that might plausibly be tolerated under Maine law.[12] Rather, it is based on a conclusion that the noncompliance evidenced at the hearing is precisely the sort that Congress did *not* intend the appropriations rider to shelter from federal prosecution.

In determining whether the Defendants have established strict compliance, the Court analyzes the Amendment's applicability on a count-by-count basis. The Ninth Circuit has held that the applicability inquiry "focuses on the conduct forming the basis of a particular charge, which requires a count-by-count analysis to determine which charges, if any, are" barred from prosecution under the rider. United States v. Kleinman, 880 F.3d 1020, 1028 (9th Cir. 2017). This is necessary to ensure "[t]he prosecution cannot use a prosecutable charge . . . to bootstrap other charges that rely solely upon conduct that would fully comply with state law," and thereby prevent states "from implementing their own laws that authorize . . . medical marijuana." Id. (alteration in original) (citing Consolidated Appropriations Act, 2016, 129 Stat. at 2332-33). Finding this persuasive, the Court undertakes a count-by-count approach to determining whether each Defendant has established the requisite strict compliance.

### A. The Bilodeau Defendants' Compliance with Maine Medical Marijuana Law

The Bilodeau Defendants are charged with conspiring to distribute marijuana, manufacturing a controlled substance, possessing marijuana with intent to distribute, possessing a firearm in furtherance of drug trafficking, conspiring to money launder, and engaging in illegal

---

[12] To be clear, technical noncompliance—for example, violation of the requirement that caregivers employ only one assistant—was established at the hearing. However, beyond mere technical noncompliance with this one-assistant-per-caregiver limitation, the Government established that the Defendants employed trim crews of five to ten people, who were paid in cash by Bilodeau or Poland. This blatant violation constituted yet another indicia of black market marijuana activity in no way authorized by Maine's medical marijuana laws.

monetary transactions. They maintain that the January 10, 2018 inspection report by MMMP authorities (Gov't Ex. A-19), which found Bilodeau's grow site at 586 Lewiston Junction Road compliant, establishes that he grew in compliance with Maine medical marijuana law. They additionally rely on their expert witness's analysis that the marijuana seized on February 27, 2018, from Bilodeau's residence was consistent with the yield from the plants inspected on January 10 (Tr. 287:1-9) to argue that his marijuana possession was compliant with state medical marijuana law. The Bilodeau Defendants contend that this evidence establishes their compliance at all times relevant to the charged offenses and, therefore, their prosecution must be enjoined.

However, the Government presented evidence that threw into significant doubt whether the Bilodeau Defendants' marijuana activity was completely authorized by Maine's medical marijuana laws. The drug ledgers seized from Bilodeau's residence indicate a sales operation that extended far beyond patient supply consistent with the MMMP. Knutson's testimony that his patient designation cards were supplied to him by Bilodeau and Bellmore, the evidence that at least one of Knutson's patients never received marijuana from his grow, the fact that Bilodeau and Bellmore were responsible for distributing marijuana grown at 230 Merrow, and the evidence that Bilodeau managed operations at 230 Merrow and Cascades, a site with an unregistered outdoor grow area, further support the inference that Bilodeau was involved in distribution practices at both locations that were substantially noncompliant with Maine's medical marijuana laws.

Given this evidence, the Court cannot conclude it is more likely than not that the Bilodeau Defendants fully complied with a core tenet of the MMMP—that caregivers' marijuana-related conduct be for the purpose of assisting qualifying patients with their use of medical marijuana. While their evidence may establish that the physical and technical aspects of the grow at Lewiston Junction Road were compliant with Maine medical marijuana law at about the time of the search, they offered nothing to refute the evidence of Bilodeau's involvement in fundamentally

noncompliant distribution and sales there and at 230 Merrow Road during the time periods relevant to the charged offenses.[13] Since the evidence indicates Bilodeau was involved in noncompliant distribution of marijuana produced at Lewiston Junction Road and 230 Merrow at the time of the February 27, 2018 searches, he cannot claim immunity from prosecution for possession of marijuana and a firearm on that day.[14] Further, his failure to establish full compliance with Maine's medical marijuana laws means his prosecution for money laundering and monetary transactions alleged to involve the proceeds of said noncompliant marijuana activity may also proceed.

The Bilodeau Defendants argue that the Amendment requires application of a heightened standard to federal investigations and searches of MMMP participants. Specifically, they argue (1) that federal agents who wish to investigate MMMP participants should be required to first gain permission from the U.S. Attorney's Office, which should grant permission only where there is adequate evidence of unauthorized conduct and (2) that search warrants for MMMP caregivers must be supported by a warrant affidavit that establishes evidence of unauthorized conduct in addition to probable cause. These are interesting (and not entirely fanciful) arguments as to what the Amendment's prohibition on the use of DOJ resources to interfere with state medical marijuana

---

[13] In their post-hearing Reply Brief, the Bilodeau Defendants state that the marijuana seized at Bilodeau's residence on February 27, 2018 "was intended for the Safe Alternatives Dispensary, where Mr. Bilodeau was starting a new job." ECF No. 655 PageID # 2649. But beyond a mention of this intention recorded by the state investigators who visited Cascades on January 10, 2018 (Gov't Ex. A-37), the Bilodeau Defendants provided no evidence to support this contention during the evidentiary hearing and offer nothing more to support it in their Reply. Weighing this relatively unsupported claim against the substantial evidence of noncompliance put forth at the hearing, the Court does not find it more likely than not that Bilodeau intended the marijuana at his residence for the Safe Alternatives Dispensary.

[14] The Bilodeau Defendants argue that evidence suggesting Bilodeau withdrew from an alleged conspiracy with Bellmore should support a finding of compliance, if not with respect to Count 1, with respect to the charged offenses limited to February 27, 2018. But Knutson's testimony that he continued working as normal at 230 Merrow after the alleged Bilodeau-Bellmore split (Tr. 468) and the trimmer testimony that crews continued to work for Bilodeau after the alleged split (Tr. 237, 398) establish the likelihood that Bilodeau continued to engage in noncompliant conduct even after his alleged withdrawal from a conspiracy with Bellmore.

programs demands. However, there is no precedent for imposing such requirements based on the Amendment, and imposing them here would lead the Court to engage in an essentially legislative exercise to which Congress is better suited. The Court declines the Bilodeau Defendants' invitation to announce explicit rules governing federal investigations based on the Amendment.

Prosecution of all counts against the Bilodeau Defendants may go forward.

B. **The Poland Defendants' Compliance with Maine Medical Marijuana Law**

The Poland Defendants were charged with ten counts in the Superseding Indictment.[15] At the evidentiary hearing, the Poland Defendants presented testimony from an expert witness, Catherine Lewis, who had reviewed discovery evidence and the caregiver paperwork from 249 Merrow Road and conducted a tour of the site with Poland some time after the February 27, 2018 search. (Tr. 99-104.) Lewis testified that, based on her analysis, the facility and the caregivers operating at the site complied with the MMMP. The Poland Defendants argue that this expert testimony and the 249 Merrow caregivers' compliance documents establish a prima facie case of strict compliance on February 27, 2018. They contend that this is enough to enjoin prosecution for all charges involving alleged misconduct on that date, including the Count 1 conspiracy charge, because if defendants were required to prove strict compliance for "every minute of every hour" of a multi-year conspiracy such as the one charged here, the Amendment's prohibition on interference with state medical marijuana laws would be rendered unenforceable.[16] (ECF No. 620 PageID # 2487, 2492.)

---

[15] These are: conspiracy to distribute marijuana (Count 1), manufacturing a controlled substance at 249 Merrow Road (Count 15), possession with intent to distribute MDMA (Count 16), possession with intent to distribute alprazolam (Count 17), possession with intent to distribute marijuana (Count 18), maintaining a drug involved premises (Count 22), money laundering (Count 35), destruction or removal of property to prevent search or seizure (Count 36), and illegal monetary transactions (Counts 40-41).

[16] Because Count 35 alleges transactions that totally predate February 27, 2018, the Poland Defendants concede that its prosecution is not barred by proof of compliance on that date.

15

As counterpoint, the Government points to evidence seized from an office at 249 Merrow as well as the testimony of several witnesses who described work they had done there. Similar to the documents seized at 72 Danville Corner Road, those taken from 249 Merrow documented large-scale transactions inconsistent with compliant distribution. Witness testimony supported the inference that the grows at 249 Merrow were part of a large-scale marijuana operation unauthorized by Maine's medical marijuana law and to which Poland was linked. Trimmers who cycled between properties in the Lewiston-Auburn area were paid by Poland for trimming at his 249 Merrow site, and he, along with Bilodeau, was one of the individuals who notified the head of the trim crews when trimming services were needed. Additionally, Poland's site contained an outdoor grow unregistered with the MMMP. Based on this evidence, the Court cannot conclude that the Poland Defendants substantially complied with Maine medical marijuana law for over a year prior and up to the February 27, 2018 search. Rather, in the Court's view, the preponderance of the evidence shows that marijuana cultivated at 249 Merrow was distributed to nonpatients and that Poland managed operations at 249 Merrow as part of a large-scale Lewiston-Auburn black-market marijuana operation with Bilodeau and Bellmore.[17]

---

[17] The Poland Defendants argue that "[t]he fact that there is alleged evidence of defendant Poland's involvement in drug trafficking cannot be inferred to the six caregivers." ECF No. 620, PageID # 2493. They also argue that the evidence of trimming at 249 Merrow cannot be linked to any of the caregivers registered there on February 27, 2018. But Poland and his companies are the parties charged in the indictment, not the caregivers. The evidence indicates he was responsible for noncompliance of the marijuana grows at 249 Merrow because he oversaw production and distribution there that in part supplied out-of-state purchasers in bulk quantities.

Defendants' failure to rebut the Government's evidence is fatal to their motion to enjoin prosecution.[18] They have not established compliance on February 27, 2018, or on any other date relevant to the charged offenses.[19] The Court rejects the Poland Defendants' claim that requiring them to prove compliance during the entire period of a charged conspiracy would result in an impossible evidentiary burden. To prove compliance throughout a multi-year conspiracy by a preponderance of evidence, defendants must put forward evidence sufficient to establish the *likelihood* of their compliance throughout the relevant time period. This does not require the sort of impossible evidentiary production the Poland Defendants seem to imagine (i.e., minute-by-minute documentation of compliance), but it certainly requires more than what was provided here, especially given the strength of the Government's evidence of noncompliance.

The Court also notes that a stay based on the Amendment is entirely inapplicable to Counts 16 and 17 (alleging possession with intent to distribute controlled substances other than marijuana) because nothing in Maine's medical marijuana laws authorizes the possession or distribution of controlled substances besides marijuana. See United States v. Kleinman, 880 F.3d 1020, 1029 (9th Cir. 2017) (holding that the appropriations rider could not bar prosecution of Counts charging offenses involving the sale of marijuana to out-of-state customers since out-of-state sales were not

---

[18] The Poland Defendants argue that it would be impossible for them to prove legitimate sales to registered patients given the confidentiality requirements of the MMMP. Poland Reply (ECF No. 659), PageID # 2654. But there are other, non-confidential, forms of evidence they could have offered to rebut the inference of illegality raised by the Government's evidence. For example, they might have found qualified patients willing to testify about purchasing medical marijuana from 249 Merrow caregivers, or they might have offered evidence to show that the records of illegal drug sales at 249 Merrow were someone else's and entirely unknown to Poland. The Court therefore concludes that Defendants cannot use the MMMP's confidentiality requirements to relieve them of their evidentiary burden to show compliant distribution of the marijuana grown at 249 Merrow.

[19] The Court does not need to decide whether proof of compliance at 249 Merrow on February 27, 2018, should immunize a defendant from prosecution for all counts involving conduct on that date since the Poland Defendants have not made that showing. But the Court notes its deeps skepticism as to this argument. It seems unlikely that the Amendment was intended to protect defendants from prosecution in a situation where there is ample evidence of noncompliance in the time leading up to the date of a search but suddenly, on that date, defendants manifest compliance.

authorized by state medical marijuana law).[20] Prosecution of all counts against the Poland Defendants may go forward.

### C. MR's Compliance with Maine Medical Marijuana Law

MR is charged with three counts: manufacturing a controlled substance, maintaining a drug-involved premises, and participating in a money laundering conspiracy. MR takes the position that its role in the 230 Merrow Road cultivation was limited to that of a landlord, and in this role, it was strictly compliant with the MMMP because its only requirement was to lease space nondiscriminately to caregivers and patients, which it did. In support of this position, MR notes that Government witnesses who testified about their involvement at 230 Merrow indicated that Kevin Dean, MR's sole member, was not "at all" involved in marijuana cultivation there and, since he was registered to grow at Lewiston Junction Road, he was in fact prohibited from entering the grow rooms at 230 Merrow. (Tr. 472.) Because 230 Merrow appeared compliant with Maine medical marijuana laws, MR contends that even if Dean had an affirmative duty to ensure the grows at MR's property were legal, he had no lawful way of discerning they were not.

But the Government's evidence links both Dean and MR to Bilodeau in a way that contradicts MR's portrayal of itself as a mere landlord, totally unaware of illegal marijuana production occurring at 230 Merrow. For one, MR did not produce any evidence of a lease agreement between itself and any particular tenant(s) at 230 Merrow; instead, the evidence indicated that Bilodeau ran the show there and at the Cascades site, which Dean owned and where he was registered to grow. It also indicated that Dean and Bilodeau shared a common, cooperative

---

[20] Given that certain parties charged in the Count 1 conspiracy have already entered guilty pleas to that count, it might similarly be reasoned that a stay based on the appropriations rider is inapplicable to Count 1—certainly, Maine's medical marijuana laws do not authorize caregivers to conspire with individuals in marijuana activity not authorized by the state medical marijuana program. But rather than delve into the question whether guilty pleas from alleged members of a conspiracy who are not participants in this proceeding may serve as evidence relevant to the Court's findings, the Court bases its findings of noncompliance on the ample evidence of such presented at the hearing.

18

interest in marijuana—they went in together on a secured loan at 230 Merrow and on a trimming machine, and they registered to grow at the same site, Cascades. Finally, among the alleged drug ledgers seized from Bilodeau's residence, multiple pages include notations of apparent payments to "Kev" and "Kevin." (Gov't Ex. B-61.)

The ample evidence that Dean and Bilodeau were close associates with respect to their marijuana-related activities makes it difficult for the Court to credit MR's argument that Dean, the LLC's sole member, was entirely unaware of the noncompliant practices at 230 Merrow such that his LLC's involvement could fairly be characterized as that of a mere landlord. Certainly, the question here is whether MR, not Kevin Dean, has established its compliance with state law for which it can be held responsible. But the Government's evidence raises the inference that MR, acting through its sole member, was not simply holding property and collecting legitimate rent payments from compliant medical marijuana caregivers. MR, which has the burden of persuasion in this proceeding, has put forward virtually no evidence to overcome this inference and establish, in the face of its sole member's close business relations with Bilodeau and the various payments to "Kev" and "Kevin" noted in the 72 Danville Corner Road ledgers, the likelihood that it lacked any interest in the allegedly noncompliant aspects of marijuana production and distribution at 230 Merrow Road.[21] See cf. United States v. Agosto-Vega, 617 F.3d 541, 553 (1st Cir. 2010) (stating that a factfinder need not "turn a blind eye to the inextricable relationship" between two corporate entities when determining whether one could be culpable for acts of the other's employee). Though it is a closer question here than it is for the other moving Defendants, MR has not proven

---

[21] Because it is irrelevant to the Court's decision, the Court disregards MR's argument that questions regarding the character of the physical evidence seized at 230 Merrow must be resolved against the Government. The Court concludes that whether or not the marijuana seized at 230 Merrow on February 27, 2018, was technically compliant with MMMP regulations, to meet its burden, MR must establish a likelihood that the company had no interest in the allegedly noncompliant aspects of marijuana production at the site (e.g., distribution and sales to non-patients, fraudulent acquisition of patient cards, etc.). It has not done so.

by a preponderance of evidence that it acted in strict compliance with Maine's medical marijuana laws. Thus, MR's prosecution for unlawful manufacture of a controlled substance at 230 Merrow, maintenance of a drug-involved premises, and conspiracy to commit money laundering may go forward.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss or Enjoin their Prosecution (ECF Nos. 334 & 404) are DENIED.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 20th day of December, 2019.